**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **JAMES RAY SALYERS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00008 |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: Pamela Meade Sargent |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, James Ray Salyers, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Salyers protectively filed an application for DIB on January 22, 2009, alleging disability as of May 7, 2008, due to neck pain, gout, high blood pressure, depression, bursitis in the left shoulder, bilateral carpal tunnel syndrome, a cyst behind the right knee, arthritis, bone spurs on the spine, bulging discs, right ankle pain and headaches. (Record, ("R."), at 11, 173-74, 192, 215.) The claim was denied initially and on reconsideration. (R. at 100-02, 106-08, 111, 113-15, 117-19.) Salyers then requested a hearing before an administrative law judge, ("ALJ"), (R. at 120.) The hearing was held on October 14, 2011, at which, Salyers was represented by counsel. (R. at 27-71.)

By decision dated November 3, 2011, the ALJ denied Salyers's claim. (R. at 11-22.) The ALJ found that Salyers met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013.[2] (R. at 13.)

_____

[2] Therefore, Salyers must show that she became disabled between May 7, 2008, the

-2-

The ALJ also found that Salyers had not engaged in substantial gainful activity since May 7, 2008, the alleged onset date. (R. at 13.) The ALJ found that the medical evidence established that Salyers suffered from severe impairments, namely obesity; status-post anterior cervical spine fusion; previous hemilaminotomy and discectomy; postoperative degenerative changes of the cervical spine; disc protrusion of the cervical spine; cervical spondylosis; disc bulge, protrusion, foraminal narrowing and compromise on the exiting left C6 and C7 roots; mild degenerative annular bulging of the lumbar spine; degenerative disc disease with spur formation of the thoracic spine; fibromyalgia; gout; and bilateral carpal tunnel syndrome, but she found that Salyers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Salyers's depression and anxiety were nonsevere. (R. at 14.) The ALJ also found that Salyers had the residual functional capacity to perform sedentary work[3] that allowed for occasional reaching, including overhead, with the left upper extremity, occasional climbing of ramps and stairs, kneeling, stooping, crouching and crawling, frequent balancing and that did not require him to climb ladders, ropes or scaffolds, to use a keyboard or to work around hazards such as moving machinery, unprotected heights and vibrating surfaces. (R. at 15.) The ALJ found that Salyers was unable

_____

alleged onset date, and December 31, 2013, the date last insured, in order to be entitled to DIB benefits.

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a) (2013).

to perform his past relevant work. (R. at 21.) Based on Salyers's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Salyers could perform, including the job as a ticket checker, a telephone clerk and a general office clerk. (R. at 21-22.) Thus, the ALJ found that Salyers was not under a disability as defined under the Act and was not eligible for benefits. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued her decision, Salyers pursued his administrative appeals, (R. at 6), but the Appeals Council denied his request for review. (R. at 1-3.) Salyers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Salyers's motion for summary judgment filed September 19, 2013, and the Commissioner's motion for summary judgment filed November 22, 2013.

## II. Facts

Salyers was born in 1971, (R. at 36, 173, 188), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Salyers has a high school education and attended one year of college. (R. at 32, 36, 197.) He has past relevant work experience as a surface coal miner and a mechanic. (R. at 33, 37.) Salyers testified that he could stand for up to 10 minutes without interruption, walk up to 100 meters without interruption and sit for up to five minutes without interruption. (R. at 38.) He stated that he had numbness in his hands as a result of carpal tunnel syndrome. (R. at 39.) Salyers testified that medication helped his symptoms of

-4-

depression and anxiety. (R. at 40.)

Dr. Haddon Christopher Alexander, III, M.D., a medical expert, was present and testified at Salyers's hearing. (R. at 50-65.) Dr. Alexander stated that Salyers's physical impairments included degenerative disc disease of the cervical spine, carpal tunnel syndrome, gout and high blood pressure. (R. at 51-52.) Dr. Alexander stated that Salyers's impairments did not meet or equal the Listing of Impairments for § 1.04A for the cervical or lumbar spines. (R. at 54.) He further stated that Salyers's impairments did not meet or equal a listed impairment. (R. at 54-56.) Dr. Alexander stated that Salyers had the residual functional capacity to occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 56.) He stated that Salyers could sit, stand and walk six hours in an eight-hour workday with normal breaks. (R. at 56.) He stated that Salyers could not climb ropes, ladders or scaffolds; frequently climb ramps and stairs; and occasionally balance, bend, crouch, kneel or crawl. (R. at 56-57.) Dr. Alexander stated that Salyers could occasionally lift items above his chest with his left shoulder. (R. at 56.) He stated that Salyers should not work around unprotected heights or heavy machinery with rapidly moving parts. (R. at 56-57.)

Vocational expert, AnnMarie Cash, also was present and testified at Salyers's hearing. (R. at 66-70.) Cash classified Salyers's work as a mechanic with the coal mines as heavy[4] and skilled. (R. at 67.) Cash was asked to consider a

---

[4] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. See 20 C.F.R. § 404.1567(d) (2013).

-5-

hypothetical individual of Salyers's age, education and work history who had the residual functional capacity to occasionally lift and carry items weighing 20 pounds, 10 pounds frequently, stand and walk no more than three hours in an eight-hour workday with normal breaks, sit no more than six hours in an eight-hour workday with normal breaks, frequently climb ramps and stairs, occasionally balance, kneel, stoop, crawl, crouch, reach with the left shoulder above chest level, no working around moving machinery with rapidly moving parts, no exposure to hazardous machinery, unprotected heights, climb ladders, ropes, scaffolds or working on vibrating surfaces and no keyboarding. (R. at 67.) Cash stated that such an individual could not perform Salyers's past work. (R. at 67.) Cash also stated that the individual could perform sedentary work, such as a ticket checker, a telephone clerk and a general office clerk. (R. at 68-69.) Cash was asked to consider the same individual, but who would be off task 30 to 40 percent of any workday. (R. at 69.) She stated that such an individual could not perform Salyers's past work and that there would be no other work available that such an individual could perform. (R. at 69-70.) When asked if the restriction to no stooping were added to any of the hypotheticals, Cash stated that there would be no jobs available that such an individual could perform. (R. at 70.)

In rendering her decision, the ALJ reviewed medical records from Julie Jennings, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Dr. Brian Strain, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Shahab M. Ehtesham, M.D.; Dr. Matthew W. Wood, Jr., M.D., a neurologist; Dr. John Marshall, M.D.; Dr. Kevin Blackwell, D.O.; and Wellmont Bristol Regional Medical Center.

-6-

On June 18, 2008, Salyers saw Dr. Matthew W. Wood, Jr., M.D., a neurosurgeon, for complaints of left neck, shoulder and arm pain following a work-related injury. (R. at 337.) Dr. Wood reported that Salyers was in no distress. (R. at 337.) Salyers had mild weakness of the left triceps, his cranial nerves and higher cortical functions were intact, and his station and gait were normal. (R. at 337.) An MRI of Salyers's cervical spine showed degenerative joint disease with loss of the normal lordosis curvature, a protrusion of disc in the left paracentral region at the C5-C6 and C6-C7 disc spaces, which resulted in the narrowing of the central canal on the left side, a compression of the cord was noted and marked narrowing of the neural foramen on the left side at both levels. (R. at 277, 393-94.) On June 26, 2008, a CT scan of Salyers's cervical and thoracic spines showed significant spondylosis and disc bulge/protrusion at both the C5-C6 and C6-C7 disc spaces with foraminal narrowing at both levels and a significant compromise on the exiting left C6 and C7 roots. (R. at 333-36.) A cervical myelogram showed spondylosis and disc protrusion at multiple levels being most marked at the C5-C6 and C6-C7 disc spaces. (R. at 331-32.) On July 9, 2008, Salyers complained of left shoulder and arm pain. (R. at 325.) His strength was intact, with the exception of the left triceps, which were mildly weak. (R. at 325.) Dr. Wood noted that Salyers had pain in his neck and left shoulder with extension of his neck. (R. at 325.) Salyers underwent an EMG, which showed severe bilateral carpal tunnel syndrome. (R. at 326, 329-30.) A cervical myelogram showed a large left foraminal disc extrusion and a small, but significant, left C5-C6 disc protrusion atop an uncovertebral osteophyte, as well as two-level compressive disease. (R. at 325.) Dr. Wood noted that this was severe and needed decompression. (R. at 325.)

-7-

On July 16, 2008, Salyers underwent a left C6-C7 partial hemilaminotomy and discectomy and a left C5-C6 partial hemilaminotomy and foraminotomy for decompression. (R. at 323-24.) On August 25, 2008, Salyers complained of neck pain, headache and left shoulder pain. (R. at 315.) Dr. Wood reported that Salyers's gait was normal, and he had full range of motion of the neck, with pain on extension. (R. at 315.) X-rays showed a large recurrent disc protrusion at the C5 disc space and osteophytes and a disc protrusion at the C6 disc space. (R. at 315, 317-18.) Dr. Wood scheduled a C5 and C6 anterior cervical discectomy. (R. at 315.) On September 2, 2008, Salyers was admitted to Wellmont Bristol Regional Medical Center where he underwent a two-level anterior cervical disc fusion without complications. (R. at 247-62.) He ambulated without difficulty and was discharged the next day in stable condition. (R. at 247.) On October 10, 2008, Salyers complained of neck pain, headaches and occasional bilateral posterior shoulder pain. (R. at 306.) Dr. Wood noted that Salyers was in no distress, and his range of motion was at 80 percent normal. (R. at 306.) Dr. Wood reported that Salyers's incision was well-healed, and he had no weakness in either upper extremity. (R. at 306.) X-rays performed indicated excellent position of Salyers's grafts and plate. (R. at 306-08.) On November 10, 2008, Salyers complained of worsening neck pain and headache. (R. at 301.) Dr. Wood reported that Salyers remained neurologically intact. (R. at 301.) Salyers's range of motion of the neck was excellent. (R. at 301.) Salyers exhibited profound cervical spasm bilaterally, which was treatable with medication. (R. at 301.) X-rays indicated excellent early fusion. (R. at 301-02.) On December 9, 2008, Chris Justus, P.A.C., a certified physician's assistant, reported that Salyers was in no acute distress. (R. at 294.) Justus reported that Salyers exhibited findings consistent with cervical spasm. (R.

-8-

at 294.) He had good range of motion of the shoulders with no signs of impingement. (R. at 294.) Salyers had no muscle atrophy, and his upper and lower extremity strengths were 5/5 and symmetric. (R. at 294.) Salyers was neurologically intact. (R. at 294.) On December 15, 2008, Salyers reported that he was doing well until he sat for a long time at a basketball game, which caused bilateral shoulder pain with numbness in his arms and hands. (R. at 293.) Dr. Wood noted that Salyers was in no acute distress. (R. at 293.)

On January 13, 2009, an MRI of Salyers's cervical spine showed postoperative and degenerative changes, including interval relief of impressions upon the cord at the C5-C6 and C6-C7 disc spaces; disc bulging was noted at the C3-C4 and C4-C5 disc spaces with no cord impingement; and a small left paracentral disc protrusion was seen at the C7-T1 disc spaces. (R. at 291-92.) On January 15, 2009, Salyers reported pain in his neck, shoulder and triceps after lifting weights in physical therapy. (R. at 290.) Dr. Wood noted that Salyers had tenderness at the base of his neck, but had full range of motion and no weakness in any muscle group of either upper extremity. (R. at 290.) On February 2, 2009, Salyers complained of stiffness in his low back and neck following the functional capacity evaluation. (R. at 286.) Dr. Wood noted that this was muscle pain due to unaccustomed activity. (R. at 286.) Dr. Wood reported that he believed Salyers could be more active and should exercise as much as possible. (R. at 286.) Salyers reported riding an exercise bike. (R. at 286.) On examination, Salyers had no focal weakness and full range of motion. (R. at 286.) Dr. Wood reported that Salyers had reached maximum medical improvement with permanent restrictions. (R. at 286.) No further surgical intervention was needed. (R. at 286.) Dr. Wood completed a

-9-

physical capacities evaluation indicating that Salyers could sit a total of seven hours in an eight-hour workday and that he could do so for up to two hours without interruption. (R. at 288.) He opined that Salyers could stand and/or walk a total of seven hours in an eight-hour workday and that he could do so for up to four hours without interruption. (R. at 288.) Dr. Wood opined that Salyers could lift and carry items weighing up to five pounds continuously, up to 20 pounds frequently and up to 30 pounds occasionally. (R. at 288.) He opined that Salyers could use his hands and feet for repetitive movements. (R. at 288.) He found that Salyers could occasionally crawl and climb and frequently bend, squat and reach. (R. at 288.) Dr. Wood opined that Salyers was mildly restricted in his ability to drive automotive equipment; moderately restricted in his ability to be around moving machinery; and that he should avoid working around unprotected heights. (R. at 288.) Dr. Wood opined that Salyers had reached maximum medical improvement with permanent restrictions. (R. at 288.)

On March 11, 2009, Dr. John Marshall, M.D., evaluated Salyers for management of his medications and pain. (R. at 282-83.) Dr. Marshall reported that Salyers could ambulate without difficulty. (R. at 282.) Salyers's motor sensory was intact. (R. at 282.) Dr. Marshall advised Salyers to continue with the restrictions as given by Dr. Wood. (R. at 283.) On September 9, 2009, Salyers reported that he was doing "fairly well." (R. at 352.) He stated that his medications controlled his neck and headache symptoms, as well as his shoulder and upper extremity symptoms. (R. at 352.)

On March 17, 2010, Salyers complained of low back and lower extremity

pain. (R. at 350.) He reported that his neck and arms were doing "okay with the medicine." (R. at 350.) Dr. Marshall reported that Salyers's physical examination was stable, and his motor, sensory and deep tendon reflexes were intact. (R. at 350.) On June 28, 2010,[5] Salyers was seen for complaints of lower back and left leg pain. (R. at 348.) Salyers reported that the pain began while he was trying to do the lifting testing at his functional capacity evaluation. (R. at 348.) Dr. Wood noted that the functional capacity evaluation report failed to note any significant complaints or injuries. (R. at 348.) Salyers ambulated with a normal gait. (R. at 348.) No focal tenderness in the lumbosacral region was noted, and straight leg raising tests were negative bilaterally. (R. at 348.) Dr. Wood noted that Salyers had recovered "nicely" from his cervical fusion. (R. at 348.) On July 14, 2010, Dr. Wood noted that Salyers was "quite muscular." (R. at 342.) Dr. Wood reported that he did not believe that Salyers had any significant injury to his lumbar spine and that his lumbar spine symptoms should not limit him significantly. (R. at 342.) Salyers was encouraged to remain as active as possible. (R. at 342.) Dr. Wood noted that Salyers helped with coaching his daughters' basketball team and with the weight lifting program. (R. at 342.) An EMG was normal. (R. at 343, 346-47.) An MRI of Salyers's lumbar spine showed mild degenerative annular bulging at the L4-L5 level slightly flattening the ventral surface of the thecal sac and degenerative disc disease with spur formation asymmetrically to the right at the T11-T12 disc space. (R. at 344.) Dr. Wood released Salyers to return to work on July 15, 2010, with cervical restrictions as previously noted and with no restrictions for his lumbar complaints. (R. at 345.) On September 15, 2010, Salyers reported that he was doing "fairly well." (R. at 339.) Dr. Marshall reported that

---

[5] Salyers was last seen by Dr. Wood in February 2009. (R. at 348.)

Salyers's neck was stable, and he ambulated without difficulty. (R. at 339.) Salyers reported that his medication helped him. (R. at 339.)

On April 20, 2011, Dr. William M. Platt, M.D., began treating Salyers in place of Dr. Marshall. (R. at 374-75.) Salyers complained of worsening neck and arm pain. (R. at 374.) Salyers weighed 257 pounds, and his blood pressure reading was 177/100. (R. at 374.) Dr. Platt noted that Salyers had fairly good motion of the neck. (R. at 374.) On May 26, 2011, Salyers underwent a nerve conduction study and EMG, which showed carpal tunnel. (R. at 376-78.) No evidence supporting radiculopathy or plexopathy were noted. (R. at 378.) On June 8, 2011, an MRI of Salyers's cervical spine was performed, which showed no acute changes. (R. at 380-82.) Salyers weighed 258 pounds, and his blood pressure reading was 162/103. (R. at 382.) He was in no acute distress, and his cervical range of motion was decreased. (R. at 382.)

On December 22, 2008, Dr. Shahab M. Ehtesham, M.D., saw Salyers for complaints of neck pain. (R. at 276-78.) Salyers had a negative neurological-psychiatric examination. (R. at 276.) His blood pressure reading was 140/90, and he weighed 260 pounds. (R. at 276.) Salyers was diagnosed with back pain, hypertension and obesity. (R. at 277.) On January 22, 2009, Salyers complained of fever, chills, body aches, sore throat and high blood pressure. (R. at 274-75.) Salyers's blood pressure reading was 130/98, and he weighed 252 pounds. (R. at 274.) Salyers's mood and affect were normal. (R. at 275.) Dr. Ehtesham diagnosed acute bronchitis, hypertension, neck pain, depression, anxiety and obesity. (R. at 275.) On May 13, 2009, Salyers complained of neck and low back pain. (R. at 385-

-12-

87.) Salyers weighed 254 pounds, and his blood pressure reading was 150/100. (R. at 386.) Dr. Ehtesham diagnosed neck and lower back pain, hypertension, depression/anxiety and class II obesity. (R. at 386.)

On March 30, 2009, Julie Jennings, Ph.D., a state agency psychologist, found that Salyers suffered from a nonsevere affective disorder. (R. at 77-78.) She found that Salyers had no restriction on activities of daily living, in maintaining social functioning, in maintaining concentration, persistence or pace and that he had not experienced any repeated episodes of decompensation of extended duration. (R. at 77-78.)

On March 30, 2009, Dr. Richard Surrusco, M.D., a state agency physician, completed a medical assessment indicating that Salyers had the residual functional capacity to occasionally lift and carry items weighing 20 pounds and frequently lift and carry items weighing 10 pounds. (R. at 80-82.) He found that Salyers could stand and/or walk a total of three hours in an eight-hour workday and sit a total of six hours in an eight-hour workday, with normal breaks. (R. at 80.) Dr. Surrusco found that Salyers had no limitations on his ability to push and/or pull, including the operation of hand and foot controls. (R. at 80.) Salyers was limited to occasional climbing of ramps and stairs, balancing, stooping and kneeling. (R. at 80-81.) Dr. Surrusco found that Salyers should never climb ladders, ropes or scaffolds, crouch or crawl. (R. at 80-81.) No manipulative, visual or communicative limitations were noted. (R. at 81.) Dr. Surrusco found that Salyers should avoid concentrated exposure to work hazards, such as machinery and heights. (R. at 82.) Dr. Surrusco noted that the medical records show that Salyers's

-13-

pain did not restrict him from sitting, standing, walking and moving about within normal limits throughout a normal sedentary job workday. (R. at 84.) He noted that the medical records did not show that Salyers's diagnosis of high blood pressure had severely affected his heart and had not resulted in severe complications. (R. at 84.) Dr. Surrusco also noted that Salyers's complaints of occasionally feeling sad did not severely impact his ability to perform daily tasks without interruption or complication. (R. at 84.)

On December 14, 2009, Dr. Brian Strain, M.D., a state agency physician, completed a medical assessment indicating that Salyers had the residual functional capacity to occasionally lift and carry items weighing 20 pounds and frequently lift and carry items weighing 10 pounds. (R. at 93-95.) He found that Salyers could stand and/or walk two hours in an eight-hour workday and that he could sit for up to six hours in an eight-hour workday. (R. at 93.) Dr. Strain found that Salyers's ability to push and/or pull was unlimited. (R. at 94.) He opined that Salyers could occasionally climb ramps and stairs, balance, stoop and kneel, but never climb ladders, ropes or scaffold, crouch or crawl. (R. at 94.) Salyers's ability for overhead reaching was limited. (R. at 94.) Dr. Strain found that Salyers should avoid moderate exposure to fumes, odors, dusts, gases and poor ventilation and avoid concentrated exposure to work hazards, such as machinery and heights. (R. at 95.) Dr. Strain noted that the medical evidence showed that Salyers's hypertension could be controlled with medication and that his headaches were not of such frequency or severity that they would interfere with his daily activities. (R. at 97.) He noted that Salyers's depression should not significantly cause problems with his daily functioning. (R. at 97.)

On December 15, 2009, Joseph Leizer, Ph.D., a state agency psychologist, found that Salyers suffered from a nonsevere affective disorder. (R. at 91-92.) He found that Salyers had no restriction on activities of daily living and that he had not experienced any repeated episodes of decompensation of extended duration. (R. at 92.) Leizer found that Salyers had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 92.) Leizer noted that the medical evidence did not indicate that Salyers's depression was severe and would prevent him from performing the mental requirements of all levels of work. (R. at 92.)

On May 14, 2011, Dr. Kevin Blackwell, D.O., examined Salyers at the request of Disability Determination Services. (R. at 356-60.) Salyers was in no acute distress, and his mental status was reported as good. (R. at 359.) Salyers's gait was symmetrical and balanced. (R. at 359.) His upper and lower joints had no effusions or obvious deformities. (R. at 359.) Salyers's grip strength was good, and his fine motor movement and skill activities of the hands were normal. (R. at 359.) Dr. Blackwell diagnosed cervical disc disease, status-post probable fusion, chronic low back pain, probable right knee Baker's cyst,[6] left shoulder pain, multiple joint arthritis, history of gout and poorly controlled hypertension. (R. at 359-60.)

Dr. Blackwell completed a medical assessment indicating that Salyers had the residual functional capacity to continuously lift and carry items weighing up to

---

[6] Baker's cyst is defined as a collection of synovial fluid that has escaped from the knee joint or from a bursa and has formed a synovial-lined sac behind the knee. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 85 (1995).

-15-

10 pounds, frequently lift and carry items weighing up to 20 pounds and occasionally lift and carry items weighing up to 50 pounds. (R. at 362-67.) He opined that Salyers could sit a total of four to six hours in an eight-hour workday and that he could do so for 30 minutes to an hour without interruption. (R. at 363.) He opined that Salyers could stand for one to two hours in an eight-hour workday and that he could do so for 30 minutes to an hour without interruption. (R. at 363.) Dr. Blackwell reported that Salyers could occasionally reach overhead with his right hand and frequently reach in other directions, handle, finger, feel, push and pull with his right hand. (R. at 364.) He opined that Salyers should avoid reaching overhead with his left hand and that he could frequently reach in all other directions, handle, finger, feel, push and pull with his left hand. (R. at 364.) He found that Salyers could occasionally operate foot controls. (R. at 364.) Dr. Blackwell opined that Salyers could occasionally balance and kneel and never climb, stoop, crouch or crawl. (R. at 365.) He found that Salyers could frequently work around humidity and wetness, dust, odors, fumes and pulmonary irritants, temperature extremes, vibrations and loud noise. (R. at 366.) He opined that Salyers should never work around unprotected heights and moving mechanical parts. (R. at 366.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

-16-

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Salyers argues that the ALJ erred by failing to give weight to Dr. Blackwell's residual functional capacity findings, in which he gave him a less than sedentary assessment. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-6.) Salyers also argues that the ALJ failed to provide support for her finding at step three of the sequential evaluation process in determining that he did not meet or equal the criteria of the mental listings. (Plaintiff's Brief at 6.)

The ALJ found that the medical evidence established that Salyers suffered

-17-

from severe impairments, namely obesity; status-post anterior cervical spine fusion; previous hemilaminotomy and discectomy; postoperative degenerative changes of the cervical spine; disc protrusion of the cervical spine; cervical spondylosis; disc bulge, protrusion, foraminal narrowing and compromise on the exiting left C6 and C7 roots; mild degenerative annular bulging of the lumbar spine; degenerative disc disease with spur formation of the thoracic spine; fibromyalgia; gout; and bilateral carpal tunnel syndrome, but she found Salyers did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Salyers's depression and anxiety were nonsevere. (R. at 14.)

Salyers argues that the ALJ erred by failing to give controlling weight to Dr. Blackwell's residual functional capacity findings. (Plaintiff's Brief at 5-6.) The ALJ noted that she was giving controlling weight to the opinions of Drs. Wood, Marshall, Ehtesham, Platt and the state agency physicians in determining Salyers's residual functional capacity. (R. at 20-21.) Based on my review of the record, I find that substantial evidence exists to support this finding. Dr. Wood treated Salyers's left arm, shoulder and neck pain and performed both of his surgeries. (R. at 247-48, 323-24.) As his treating physician and a specialist, Dr. Wood's opinion was properly given great weight. *See* 20 C.F.R. §§ 404.1527(c)(2)(5) (2013). Dr. Blackwell's musculoskeletal examination findings were benign. (R. at 359.) He found that Salyers's gait was symmetrical and balanced; his shoulder and iliac crest height was good and equal bilaterally; his upper and lower joints had no effusions or obvious deformities; his upper and lower extremities were normal for size, shape, symmetry and strength; his grip strength was good; and his fine motor

-18-

and skill activities of his hands were normal. (R. at 359.) Based on my review of the record, I find that the medical evidence, including Dr. Blackwell's own examination findings, does not support Dr. Blackwell's opinion that Salyers was not capable of performing even sedentary work.

On November 10, 2008, Dr. Wood reported that Salyers remained neurologically intact. (R. at 301.) His neck range of motion was excellent. (R. at 301.) Although he had profound cervical spasm, Dr. Wood noted that it was treatable with medication. (R. at 301.) On February 2, 2009, Salyers had no focal weakness and full range of motion. (R. at 286.) Dr. Wood reported that Salyers had reached maximum medical improvement with permanent restrictions. (R. at 286.) Dr. Wood completed a physical capacities evaluation indicating that Salyers could sit a total of seven hours in an eight-hour workday and that he could do so for up to two hours without interruption. (R. at 288.) He opined that Salyers could stand and/or walk a total of seven hours in an eight-hour workday and that he could do so for up to four hours without interruption. (R. at 288.) Dr. Wood opined that Salyers could lift and carry items weighing up to five pounds continuously, up to 20 pounds frequently and up to 30 pounds occasionally. (R. at 288.) He opined that Salyers could use his hands and feet for repetitive movements. (R. at 288.) He found that Salyers could occasionally crawl and climb and frequently bend, squat and reach. (R. at 288.) Dr. Wood opined that Salyers was mildly restricted in his ability to drive automotive equipment; moderately restricted in his ability to be around moving machinery; and that he should avoid working around unprotected heights. (R. at 288.)

On March 17, 2010, Dr. Marshall reported that Salyers's physical

-19-

examination was stable, and his motor, sensory and deep tendon reflexes were intact. (R. at 350.) On June 28, 2010, no focal tenderness in the lumbosacral region was noted, and straight leg raising tests were negative bilaterally. (R. at 348.) Dr. Wood noted that Salyers had recovered "nicely" from his cervical fusion. (R. at 348.) On July 14, 2010, Dr. Wood noted that Salyers was "quite muscular." (R. at 342.) Dr. Wood reported that he did not believe that Salyers had any significant injury to his lumbar spine and that his lumbar spine symptoms should not limit him significantly. (R. at 342.) Salyers was encouraged to remain as active as possible. (R. at 342.) Dr. Wood noted that Salyers helped with coaching his daughters' basketball team and with the weight lifting program. (R. at 342.) An EMG was normal. (R. at 343, 346-47.) An MRI of Salyers's lumbar spine showed mild degenerative annular bulging at the L4-L5 level slightly flattening the ventral surface of the thecal sac and degenerative disc disease with spur formation asymmetrically to the right at the T11-T12 disc space. (R. at 344.) On September 15, 2010, Dr. Marshall reported that Salyers's neck was stable, and he ambulated without difficulty. (R. at 339.) In addition, Salyers reported on several occasions that he was doing well and that his medication helped with his symptoms. (R. at 339, 350, 352.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Furthermore, Salyers's activities of daily activities also are inconsistent with Dr. Blackwell's restrictive residual functional capacity findings. Salyers testified that he watched television, prepared frozen meals and sandwiches, did the laundry, drove, shopped, paid the bills and attended his daughters' sporting events each week. (R. at 38-39.) Salyers informed Dr. Wood that he coached his daughters'

-20-

basketball team and a weight lifting program. (R. at 342.) Based on this, I find that the ALJ properly weighed the medical evidence.

Salyers also argues that the ALJ failed to provide support for her finding at step three of the sequential evaluation process that he did not meet or equal the criteria of the mental listings. (Plaintiff's Brief at 6.) I find this argument unpersuasive. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2013). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2013). The Fourth Circuit held in *Evans v. Heckler,* that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.""' 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

The ALJ found that Salyers's anxiety and depression were not severe at step two of the sequential process. (R. at 14.) The ALJ was not required to analyze whether Salyers's anxiety and depression met or equaled the criteria of the listings because those impairments were found to be nonsevere at step two of the process. *See Zegray v. Colvin*, 2013 WL 1566632, *8 (D. S.C. Apr. 12, 2013) (holding that

-21-

because "the ALJ found at step two that Plaintiff's alleged impairments of depression, anxiety, and alcohol and marijuana abuse were not severe impairments, she was not required to consider whether those alleged impairments equaled a Listing."); *Washington v. Astrue*, 698 F. Supp. 2d 562, 581 (D. S.C. Mar. 17, 2010) (finding that because "the ALJ did not find Plaintiff's obstructive sleep apnea to be 'severe,' there was no reason for him to assess whether it met or equaled a Listing.").

Regardless, the ALJ noted in her residual functional finding that on March 30, 2009, state agency psychologist Jennings found that Salyers had no restriction in activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 18, 77-78.) In December 2009, state agency psychologist Leizer found that Salyers had no restriction in activities of daily living and that he had not experienced any episodes of decompensation. (R. at 18-19, 91-92.) He found that Salyers had mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 92.) Dr. Blackwell noted in May 2011 that Salyers's mental status was good. (R. at 359.) The record indicates that Salyers received minimal treatment for his anxiety and depression. He saw a nurse practitioner for his anxiety and depression and was prescribed Daypro. (R. at 40.) Salyers stated that the Daypro helped his symptoms. (R. at 40.) *See Gross,* 785 F.2d at 1166. He has never been in counseling and has never been to the hospital or emergency room because of his depression and anxiety. (R. at 40.) None of Salyers's treating physicians have placed limitations on his work-related mental abilities.

-22-

Based on this, I find that the ALJ properly weighed the medical evidence of record. I also find that substantial evidence exists to support the ALJ's finding with regard to Salyers's physical and mental residual functional capacities.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical and psychological evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Salyers's physical and mental residual functional capacities; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Salyers was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Salyers's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:      July 25, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-24-